933 A.2d 950

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, PETITIONER–RESPONDENT, v. TOWN & COUNTRY DEVELOPERS, INC., RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued September 24, 2007—Decided October 19, 2007.

282

Before Judges PARRILLO, GRAVES [1] and ALVAREZ.

*Gabriel M. Ambrosio,* argued the cause for appellant Town & Country Developers, Inc. *(Gabriel M. Ambrosio,* attorney; *John T. Ambrosio,* on the brief).

*Robert A. Marshall,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection *(Anne Milgram,* Attorney General of New Jersey, attorney; *Mr. Marshall,* on the brief).

The opinion of the court was delivered by

PARRILLO, J.A.D.

In this environmental enforcement action, appellant Town & Country Developers, Inc. (T & C) appeals from a final decision of the New Jersey Department of Environmental Protection (DEP) assessing T & C a civil administrative penalty of $604,110 for violating provisions of the New Jersey Water Pollution Control Act (Act), *N.J.S.A.* 58:10A–6, and regulations promulgated thereunder, *N.J.A.C.* 7:14A–22.3(a), by constructing and operating a residential sewer line prior to obtaining a permit. Appellant contends that its violation is "minor" and therefore falls within the Grace Period Law, *N.J.S.A.* 13:1D–125 to –133, but that even if not so exempted, the penalty was erroneously calculated and should be substantially reduced. We disagree with both contentions, and affirm.

The facts are undisputed and stipulated. By way of background, in the late 1990's, T & C commenced construction of a

---

[1] Judge Graves did not participate in oral argument. However, the parties consented to his participation in the decision.

602–unit residential development in the Township of Nutley, comprised of 569 townhouses and 33 single-family homes to be constructed in six phases. The sanitary sewers for the project, to be connected to the wastewater conveyance system owned and operated by the Passaic Valley Sewerage Commissioners (PVSC), were constructed by T & C over a ten-day period in October and November, 1998. The project's sanitary sewer extension, force main and pumping station were built to serve a total design flow of 138,000 gallons per day. Although T & C partially prepared the Treatment Works Approval (TWA) permit application on June 11, 1998, based on all six phases, T & C did not complete and file the application with the DEP until June 10, 1999, more than six months after construction of the sewer line and after two residential units in the first construction phase (section 6) were already built and occupied. In fact, the DEP issued a permit to T & C on July 30, 1999,[2] almost two weeks after the sewer line was in use on July 19, 1999.

Because the "dry-sewer line" provisions of the Act prohibit the construction of sewer lines without approvals, even if these lines are never used, *N.J.S.A.* 58:10A–6, on March 18, 2003, following investigation, the DEP issued to T & C an Administrative Order and Notice of Civil Administrative Penalty Assessment under the agency's penalty-setting regulations. These regulations apply to both the installation and operation of a sewer line without approval, *N.J.A.C.* 7:14–8.8, and allow penalties to be assessed against persons that authorize, approve, endorse or allow the construction of a sewer line in violation of the Act, *N.J.A.C.* 7:14–8.8(b)(1). The regulations provide an assessment formula for the construction of a sewer line without approval, *N.J.A.C.* 7:14–8.8(b)(2), and a formula to impose an additional sum for the actual operation of the sewer line without approval, *N.J.A.C.* 7:14–8.8(b)(3).

---

[2] DEP approval followed the requisite township approval on July 7, 1998 and PVSC endorsement ten months later on May 20, 1999.

As to the former, the penalty is equal to the: (seriousness) ×
(conduct) × ($1.00).  *N.J.A.C.* 7:14–8.8(b)(2).  "Seriousness" is
based on project development size and equates to "one-half of the
design flow (in gallons per day) as determined from the permit
application for that facility or project ...," or estimated flow
established by regulation at *N.J.A.C.* 7:14A–22.3.  *N.J.A.C.* 7:14–
8.8(b)(2)(i).  The "conduct" under the formula is either 1.00, for
conduct that is "intentional, deliberate, purposeful, knowing or
willful[,] or ... 0.75 for any other conduct."  *N.J.A.C.* 7:14–
8.8(b)(2)(ii)(1),(2).  "Each day ... [of] construction ... [that]
continues without ... approval ... [is a] separate and distinct
violation."  *N.J.A.C.* 7:14–8.8(b)(2)(iii).  For the actual operation of
a treatment works without a permit, one of two methods for
assessing penalty, chosen at the DEP's discretion, *N.J.A.C.* 7:14–
8.8(b)(3), simply doubles the total penalty calculated for construc-
tion without a permit.  *N.J.A.C.* 7:14–8.8(b)(3)(i).[3]

Utilizing this formula, the DEP calculated total design flow of
only 40,275 gallons per day (as opposed to the 138,000 gallons
projected for the entire project),[4] then multiplied one-half the
estimated design flow by a factor of 1.00, based on finding T & C's
conduct knowing and intentional, and accepted the total number of
construction days as ten, based on data supplied by T & C. These
calculations yielded a penalty of $201,370 for the illegal construc-

---

[3] The other methodology utilizes the total design flow identified on the permit
application for the facility or the projected or estimated flow established by
regulation at *N.J.A.C.* 7:14A–22.3.  *N.J.A.C.* 7:14–8.8(b)(3)(ii)(1).  Similar to the
formula for penalties for construction without a permit, the total design flow is
multiplied by a factor of 1.00 or 0.75, depending on whether the conduct is
"intentional, deliberate, purposeful, knowing or willful," or, some lesser con-
duct.  *N.J.A.C.* 7:14–8.8(b)(3)(ii)(2).  Each day of operation constitutes an addi-
tional violation.  *N.J.A.C.* 7:14–8.8(b)(3)(ii)(3).

[4] 40,275 gallons per day is the projected total design flow for only sections one
and six of the project, consisting of 33 four-bedroom single-family units each
with a presumed design flow of 300 gallons per day, and 135 two-bedroom
townhouses, each with a presumed design flow of 225 gallons per day.  *N.J.A.C.*
7:14A–22.3.

tion and double that amount, $402,740, for the actual operation of the sewer line without a permit, for a total assessment of $604,110.

T & C contested the assessment and consequently the matter was transferred to the Office of Administrative Law (OAL). Following a plenary hearing, the Administrative Law Judge (ALJ) determined that although T & C knowingly violated the Act, and the violations materially undermined or impaired the goals of the regulatory scheme, and the civil administrative penalties were properly assessed under the penalty setting regulations, nevertheless such penalties were excused by operation of the Grace Period Law, because "minor" in nature, *N.J.S.A.* 13:1D–129(b)(1)–(6). Following exceptions filed by the parties, the DEP's Deputy Commissioner adopted the factual findings of the ALJ's Initial Decision but rejected the legal conclusion that the Grace Period Law excused T & C from penalties, concluding that the facts establish that the violations were purposeful and knowing, that the violations were not corrected, and that the violations undermine the very purpose of the dry-sewer law prohibitions under the Act.

On appeal, T & C contends the violations are "minor" and therefore excusable under the Grace Period Law, and alternatively the penalty was erroneously calculated as based in part on total projected flow for the entire project rather than for the units actually built or for the section then under construction. We disagree with both contentions.

I

■ Generally speaking, the broad environmental "purpose of the [A]ct is to facilitate the restoration and maintenance of unpolluted surface and ground waters of the State in order to protect the water and the environment." *N.J. Builders Ass'n v. N.J. Dep't of Envtl. Prot.,* 169 *N.J.Super.* 76, 83, 404 *A.*2d 320 (App. Div.), *certif. denied,* 81 *N.J.* 402, 408 *A.*2d 796 (1979). "[W]ater quality standards and permit programs ... ensure that water pollution will not worsen." *Ibid.* Thus, the DEP "commissioner shall have power to ... adopt ... and enforce ... reasonable

codes . . . to prevent, control or abate water pollution . . . throughout the State. . . ." *N.J.S.A.* 58:10A–4.

In addition, "water pollution prevention [under the Water Pollution Control Act] is directly related to water quality planning programs" such as the Water Quality Planning Act, *N.J.S.A.* 58:11A–1 to –16. *N.J. Builders Ass'n, supra,* 169 *N.J.Super.* at 84, 404 *A.*2d 320. The Water Quality Planning Act provides "that areawide waste treatment management planning processes should be developed and implemented . . . to assure adequate control of sources of water pollutants in the State." *Id.* at 85, 404 *A.*2d 320 (quoting *N.J.S.A.* 58:11A–2(b)). Both acts "seek to prevent the degradation of water quality and to preserve the environment . . . . [in order] to promote public health and welfare. . . ." *Ibid.*

One means to this end, in addition to the establishment of water quality standards, is through DEP's permitting or pre-approval process. *See N.J.S.A.* 58:10A–2, –6.3. Thus, the Act provides in Section 6 that it is "unlawful for any person to build, install, modify or operate any facility for the collection, treatment or discharge of any pollutant, except after approval by the department pursuant to regulations adopted by the commissioner." *N.J.S.A.* 58:10A–6(b). Consistent therewith, implementing regulations prohibit both the construction and operation of a "treatment works" unless it is in conformance with a treatment works approval. *N.J.A.C.* 7:14A–22.3(a).

The purpose of this provision in particular is to provide the DEP with ultimate authority to decide whether any project may adversely affect sewer infrastructure and statewide water quality. *See N.J.S.A.* 58:10A–4; *see generally N.J. Builders Ass'n, supra,* 169 *N.J.Super.* at 83–85, 404 *A.*2d 320. More specifically, according to the DEP's chief of water compliance, pre-approval allows the DEP to ensure "that the sewer lines that the project will be discharging into have sufficient capacity in order to carry the wastewater without backing up into basements or coming out of manholes[;]" that the receiving facility has the capacity to accept both the actual flow and the future committed flow from other new

projects; and that the amount of water taken, transferred and returned is sufficient for aquifer and surface water recharge. To strengthen enforcement of the State's water pollution control and prevention program, the Act provides for a range of stringent administrative penalties. *N.J.S.A.* 58:10A–10. Indeed, the penalty assessment formula is specifically structured to serve as both a specific deterrent against the violator and a general deterrent for the regulated community. *See State v. Koziol,* 157 *N.J.Super.* 499, 502–03, 385 *A.*2d 251 (App.Div.1978) (holding that the primary purpose of penalties is to deter the violator and the regulated community as a whole from violating regulations—the thrust is not merely remedial but includes the element of prevention).

To be sure, the Grace Period Law allows grace periods for penalties "for minor violation [of environmental laws] that have minimal, if any, effect upon public health, safety or natural resources...." *N.J.S.A.* 13:1D–125. A penalty may be imposed for a "minor" violation if the violation is not corrected during the grace period. *N.J.S.A.* 13:1D–128. Moreover, there are six criteria for determining whether violations are "minor," *N.J.S.A.* 13:1D–129(b)(1)–(6), and the failure to meet any one of these factors renders the exemption of the Grace Period Law inapplicable. *Id.*; *N.J. Dep't of Envtl. Prot. v. Marisol, Inc.,* 367 *N.J.Super.* 614, 631, 845 *A.*2d 147 (App.Div.2004). For present purposes, three such criteria are:

> The violation is not the result of the purposeful, knowing, reckless or criminally negligent conduct of the person responsible for the violation;
>
> . . .
>
> The violation does not materially and substantially undermine or impair the goals of the regulatory program;
>
> . . .
>
> The activity or condition constituting the violation is capable of being corrected and compliance achieved within the period of time prescribed by the department pursuant to subsection b. of section 3 of *P.L.* 1995, *c.* 296.
>
> [*N.J.S.A.* 13:1D–129(b)(1),(3),(6).]

Simply put, a "minor" violation is one that is "not purposeful, ... does not materially and substantially undermine or impair the

goals of the regulatory program," and is capable of correction. *Marisol, supra,* 367 *N.J.Super.* at 628–29, 845 *A.*2d 147.

Here, although finding T & C's conduct "intentional, deliberate, purposeful, knowing or willful" for purposes of penalty setting under *N.J.A.C.* 7:14–8.8, the ALJ, in exempting T & C from penalty, inexplicably failed to find the very same conduct "purposeful" for purposes of the Grace Period Law, *N.J.S.A.* 13:1D–129(b)(1). The Deputy Commissioner rejected this rationale and so do we. We perceive no meaningful difference in the standard defining the requisite degree of culpability under either scheme, and therefore no justification for the disparate application of the same concept. In any event, the record amply supports the agency determination of purposeful conduct. As the ALJ noted, T & C was a major developer in the building trade, employed professionals with significant experience, was aware of regulatory requirements, prepared an application for approval in advance of construction, failed to report its violations, and provided no evidence of mistake.

We also agree with the agency's finding that T & C's violations "materially and substantially undermine[d] or impair[ed] the goals of the regulatory" scheme, a determination reached by the ALJ as well. As noted, actual water pollution need not be proven since the penalty is designed to deter the mere construction of a sewer line without approval because such actions prevent the DEP from fulfilling critical statutory responsibilities to protect the public health and safety. And finally on this score, T & C's violations are not capable of remediation. In this regard, the offense is not the mere failure to file a timely treatment works application, but rather the actual construction and operation of the treatment works. Obviously, T & C never removed the offending sewer infrastructure as it would have been impractical, and its actual operation of the treatment works without a permit was a violation simply not capable of correction. *N.J.S.A.* 13:1D–129(b)(6).

T & C's reliance on *Marisol* is misplaced. There, we determined that in light of the DEP's failure to promulgate regulations

implementing the Grace Period Law, the agency bears the burden of proving that challenged violations are not "minor" pursuant to *N.J.S.A.* 13:1D–129(b).[5] *Supra,* 367 *N.J.Super.* at 628, 845 *A.2d* 147. We vacated the imposition of monetary penalties in part because Marisol remediated its violations "virtually on the spot," citing *N.J.S.A.* 13:1D–131. *Id.* at 616, 629, 845 *A.2d* 147. Here, in contrast, the violations were not remediable and the evidence otherwise established that T & C did not satisfy all of the criteria necessary to render its violations "minor." As such, the Grace Period Law does not exempt T & C from penalty.

## II

T & C argues, alternatively, that the penalty should be significantly reduced, being erroneously calculated based on the wrong "seriousness" and "conduct" factors. Specifically, T & C contends that the conduct factor should be 0.75 for conduct that is not "intentional, deliberate, purposeful, knowing or willful," *N.J.A.C.* 7:14–8.8(b), and further that the DEP used the wrong design flow to determine the seriousness factor, contending that the penalty instead should have been calculated using the design flows from either the actual units built or that portion of the development under construction prior to receipt of the permit. As to the former, we have already mentioned the evidence supporting utilization of the higher conduct factor of 1.00. As to the latter, we are satisfied that the DEP used an appropriate design flow that was actually substantially less than the development's total projected flow of 138,000 gallons per day. Indeed, DEP's decision to use what it thought to be the total projected flow for the entire project was reasonable under the governing regulation, which provides that the seriousness factor "shall be . . . one-half of the design flow . . . for that . . . project," as determined by the permit

---

[5] Since then, on August 6, 2007, the DEP has promulgated regulations classifying rules as "minor" or "non-minor" under the Grace Period Law. 38 *N.J.R.* 2919(a) (July 17, 2006). Water Pollution Control Act rules at *N.J.A.C.* 7:14–8.8 and *N.J.A.C.* 7:14A–23.3 have been designated as "non-minor." *Ibid.*

application. *N.J.A.C.* 7:14–8.8(b)(2)(i),(3)(ii)(1). And the application submitted in this case referred to the entire six-phase development. T & C therefore has simply failed to demonstrate that DEP's application of *N.J.A.C.* 7:14–8.8 was arbitrary or unreasonable.

We have reviewed T & C's remaining contentions and find them lacking in merit. *R.* 2:11–3(e)(1)(D),(E).

Affirmed.